REBECCA NIXON et al. *v.* RALTON PORTER et al.

1. DEED: DESCRIPTION OF LAND: MODE OF IDENTIFYING IT.—Where the description of land conveyed in a deed, mentions as the starting-point of the boundaries, the corner of another tract of land which is referred to only by the name of its owner or supposed owner, it is not competent, in an action of ejectment to recover the land so conveyed, in order to identify it with the land in possession of the defendant, to show a mistake in the deed as to the name of the owner of the land referred to as a starting-point. But the evidence must show that the land so referred to was owned, or at least claimed, by the person mentioned in the deed.

2. SAME: EJECTMENT: IDENTITY OF LAND MUST BE PROVEN.—The plaintiff in an action of ejectment, who relies upon a deed as the foundation of his title, must show, with reasonable certainty, by proof that the land in the possession of the defendant is embraced in his deed.

3. EJECTMENT: DEFENDANT HAVING COLOR OF TITLE MAY SET UP OUTSTANDING TITLE.—A defendant in ejectment having color of title is not a mere intruder; and where he has such color of title, he may set up a subsisting outstanding title in a stranger to defeat the plaintiff.

4. STATUTE OF LIMITATIONS: ADVERSE POSSESSION MUST BE CONTINUOUS.—An adverse possession must be continuous and uninterrupted for the period prescribed by the Statute of Limitations, in order to constitute a bar; and hence, if the party before the expiration of the period of limitation, abandons the possession, and afterwards exercises no control over the land, it will not be sufficient.

5. EJECTMENT: MESNE PROFITS, RATE OF, WHERE IMPROVEMENTS MADE BY DEFENDANT ARE DESTROYED.—Where the improvements made on the land by the defendant in an action of ejectment have been destroyed by casualty before the trial, and he is thereby deprived of his right to compensation for them in case the plaintiff recovers the land, the plaintiff will not be entitled to recover as mesne profits or rents during any portion of the time of the defendant's pos-

VOL. IX.—26

session, anything more than the reasonable value of the rent of the premises, without the improvements made by the defendant and destroyed.

ERROR to the Circuit Court of Hancock county. Hon. William M. Hancock, judge.

This was an action of ejectment, instituted under the Pleading Act of 1850, by the heirs of John Porter against Samuel White and Rebecca Nixon, to recover possession of a tract of land situated in the Bay of St. Louis in said county, together with the rents and mesne profits.

The defendants pleaded a general denial, and gave notice that Mrs. Nixon would claim the value of the improvements made by her. There was a trial at the June term, 1857, which resulted in a verdict and judgment for the plaintiff. The defendants sued out a writ of error, and the judgment was reversed by this court, and a new trial granted. See 34 Miss. R. 697.

The declaration claimed the *locus in quo* by the same description as is contained in the deed from Charles Nicaise to John Porter, hereinafter set out.

On the trial, the plaintiff read without objection a deed from C. Nicaise to Captain John Porter, dated 3d day of December, 1816, which conveys to the grantee " all that piece of land situate on the Bay St. Louis, bounded as follows : beginning at the southeast corner of the land of Lieut. Rapp, from thence running north seventy-eight degrees west, twelve hundred toise, to a post; thence south twelve degrees west, thirty toise, to a post ; thence south seventy-eight degrees east, twelve hundred toise, to the Bay St. Louis ; thence westwardly along the bay to the place of beginning; containing forty arpents of land."

Plaintiff then, for the purpose of showing " that defendants claimed title to the premises in controversy through White" (*quære*, Porter ?), and under a deed from Pray, as administrator of Avery, and " also to show that the chancery proceeding was void, and also to show fraud," read in evidence a deed from P. R. R. Pray, administrator of one Avery, to White, and a deed from White to Rebecca Nixon.

The deed from Pray to White is dated 25th June, 1836, and

Nixon et al. *v.* Porter et al.

purports to be made by Pray, as administrator of Avery, in pursuance of a decree of the Chancery Court, which decree was based upon a bill filed by White, to procure a conveyance of two tracts of land, which had been sold by Avery in his lifetime, as collector of taxes, for the purpose of collecting the taxes due thereon.

The first tract conveyed by the deed is described as " owned by John W. Addin, situate in the town of Shieldsborough, in the county of Hancock, and bounded on the north by lands of Capt. John Porter, and on the south by lands of Cadet Lafontaine ; on the east by the Bay of St. Louis, and on the west by lands of the United States ; being seven chains in width, and forty arpents deep."

The second tract is described as follows :

" Owned by Capt. Porter, otherwise called Capt. John Porter ; situated in the town and county aforesaid, and bounded on the north by the lands of Nathaniel W. Hyde, on the south by John W. Addin, on the east by the Bay of St. Louis, and on the west by the lands of the United States ; being one arpent in width, and forty in depth."

The deed from White to Mrs. Nixon is dated 23d May, 1850, and conveys land situated in Hancock county, and bounded " on the south by lands belonging to the heirs of P. R. R. Pray, deceased (being the dividing line between said heirs and said White, as determined and established by an instrument of writing between said parties, executed the 9th of March, 1849, and recorded in Book F. of the registry of deeds for said county); and on the north by lands of. said White, on the east by the Bay of St. Louis, and on the west by public lands; having a front on the bay of seventy feet by forty arpents in depth, between parallel lines."

Plaintiffs also read in evidence a notice, signed by the attorneys of defendants, and directed to, and served on, the plaintiff, to the effect that the defendants would claim the sum of $10,000, " for all such improvements as are standing on the land sued for, and claimed by plaintiffs."

From the deed of Nicaise to Porter, it appears that the Rapp tract is north of the Porter tract, as shown in Fig. 1; and from the deed of Pray to White, it appears that the Hyde tract is on the north of the Porter tract, and that the Addin tract is south of it, and that the Cadet Lafontaine tract is south of the Addin tract, as shown in Figure 2. (For Diagram, see next page.)

Figure 1.

Figure 2.

A toise is about 6 feet; a chain 66 feet.

The plaintiff then introduced the following testimony, to show the identity of the land described in the deed of C. Nicaise, with that occupied by defendants:

1. Charles Farvè stated that he was 58 years old, was born in Hancock county, and has lived there all his life. He knew C. Nicaise, and had seen Capt. John Porter. In 1816 or 1817, Porter made a clearing on lands near where witness built a fence for Williams and Hyde; he also put up a log building for a hospital, but never finished it: he was then on gun-boats on the Gulf, and he buried his dead near the clearing. This clearing was made by men under Porter's charge, and was about one arpent in width, fronting on the Bay, and three or four arpents in depth. "Porter went into the possession of the premises sued for, built a log-house, and put up tents; lived on the land, and had the sick carried there, and attended them." Witness assisted Carver (who was a United States surveyor) to run the line between the Hyde tract and the Porter tract. Carver said this line was the northern boundary of the Porter tract. Witness and Carver ran this line three times. The Porter tract is bounded on the north by the Hyde tract, on the east by the Bay of St. Louis. Witness don't know but one corner, and that is the corner on the north line. Witness saw a post there, near the bank of the Bay St. Louis.

Charles Nicaise told witness this was the same tract sold by him to Porter. Witness never knew Lieut. Rapp, or Addin. Tracts of land were generally sold with a front on the bay of one arpent, and running back forty arpents, between parallel lines. The clearing on the Porter tract was near the Hyde tract. Witness can't state how far the hotel of Mrs. Nixon was from the Hyde line, but thinks it was near the south side of the improvements. The improvement now extends further south than when Porter was there. Witness applied to C. Nicaise to buy more land. Nicaise said he could not sell more, as he had sold this tract to Porter. Witness bought land from Nicaise. Witness did not run the south line of the Hyde tract through to the rear line. Witness knew where the stake was, and he had showed Elihu Carver, Jr., where it had stood. It is now destroyed. "The land described in the deed from Pray to White, and from White to Nixon, is the same as described in Porter's deed."

Cross-examined. The description of the land in the deed from Nicaise to Porter was read to witness, and he was asked, if he knew where the land lay, as described in the deed; he answered he did not. Witness further stated, he did not know from his own knowledge, or from public report, where the southeast corner of Lieut. Rapp's land was; he never knew Rapp, and never knew of his having a tract of land at Bay St. Louis. Witness is not a surveyor, and does not know what a "toise" is. He does not know any of the posts specified in the deed from Nicaise to Porter. Witness could not, from that deed, ascertain the metes and boundaries of the land, as therein described, and he does not know where they are, as thus described; and he does not know how much land Porter owned. Witness only knew one line; the house was near the south line; about one arpent was cleared. In 1816, Williams owned the land on the north, called the Hyde tract. There was no clearing at that time north of Cadet Lafontaine tract. Witness knows the land spoken of by him as the Porter tract was in fact the Porter tract, because Carver told him so, and Carver had surveyed it twice,—once for Williams and once for Hyde. Williams bought the Hyde tract of Bosworth. Witness and Westbrook built a fence on the Hyde tract. There is no line described in the deed from Nicaise to Porter, that witness knew. Porter never owned any other tract of land, and never improved any other tract of land than the one described by witness as the Porter tract.

Re-examined. States, that he could take a compass and start from the southeast corner of the Hyde tract, which is the northeast corner of the Porter tract, and run the lines as described in the deed. Witness has lived at the Bay many years, and lives there now, and he never heard of any claim, but that of Porter, to the Porter tract, from the time Porter took possession, in 1816, till the year 1850, when Mrs. Nixon went into possession; and that from the year 1819, when Porter left, to 1850, the land was unoccupied.

2. Edwin F. Russ stated, that he had lived in Hancock county eighteen or twenty years, and that he knew something about lands at the Bay. Witness was guardian for the minor heirs of P. R. R. Pray; and defendant White told him, that there was a tract of land, the Porter and Addin tract, that belonged to him, White, and the said heirs; that he had acquired it by tax sale, and did not

consider the title worth much, but it would be good after a while by limitation. About eight or nine years ago, witness and said White divided the tract, and witness chose for the heirs of Pray the southern part of the tract. No one was in possession when the division was made.

Cross-examined. Witness could not tell where the land lay, as described in the deed from Nicaise to Porter.

Re-examined. White told witness, that their (White's and Pray's) title was a tax title, which was not good, but that it would be good in a year or two, by limitation. In the division, White took the Porter tract, and witness took the Addin tract.

3. John Westbrook stated, that he first came to Hancock county in 1816, but he did not come to reside permanently until 1819; he has lived in Hancock and Harrison counties ever since 1816. Witness knew Captain Porter; he was in command of the brig Boxer, and witness was a hand on the brig. Witness knew the Porter tract; it was bounded north by Williams (Hyde tract), east by Bay St. Louis, south by the Addin tract, west by public land. Knew Addin; he was a merchant in New Orleans, and his tract extended to the land of Cadet Lafontaine. Knew that Porter bought the land from Nicaise, and he learned this from both Porter and Nicaise. Witness made rails on the land in 1819. Porter was in possession; put a cabin on it, called Porter's hospital. Witness knew where the northeast corner of the Rapp tract was, and could put his foot within a foot of the corner. Mrs. Nixon's hotel was on the Porter tract. Witness was chain-carrier for Elihu Carver for sixteen years, and he ran a line between the Addin and Porter tract, but did not run it back further than the first branch. Witness knew Lieut. Rapp; he was on the General Jackson, in 1817, in the Carthaginian war. Witness has not heard of him since. Rapp had a tract of land called by his name, but witness does not know whether he had any title or not.

Cross-examined. Witness came to Hancock county in 1819, but he came out first in 1816, from Norfolk, Va. Saw Porter in 1816, at the Bay St. Louis; he played billiards at the Bay, at a tavern kept by Smith. Toulme and Johnson were at the Bay St. Louis, when witness first came there. Witness became chain-carrier in 1821; he can't say where the posts (on the line of the Porter tract)

are; thinks they are burnt down. He can't tell, from the description in Porter's deed, where the land lies. The Rapp claim was on the south side of the Porter claim, but witness don't know its boundaries. Witness thinks the Rapp tract was south of the Addin tract, or somewhere about there.

Plaintiff proved the annual value of the rent, from 1853 to 1858, to be $450 to $500; that Mrs. Nixon built a hotel in 1852, and it was burnt in May, 1858, after the commencement of this suit, and that the house was insured.

The defendants read in evidence the deed from White to Mrs. Nixon, before referred to, " to show her possession of the portion of land claimed by plaintiffs, and that she entered under color of title and in good faith." They read in evidence the following extract from the 3d volume of the American State Papers, viz.:

" Page 9, No. 22. Martial and Joseph Nicaise. Original claimant, Philip Soucier. Spanish ord. settlement, date of claim, 27th August, 1781. Quantity of claim, 20 arpents front, 40 arpents deep. Area, 800 arpents. Where situated, Bay St. Louis. By whom paid, Peter Piemas. When surveyed, no survey. Cultivation and habitation from August 17th, 1781, to 1813."

They then read in evidence the second section of an Act of Congress, entitled " An act confirming reported and allowed claims to lands between the Perdido and Mississippi," passed March 3d, 1819, for the purpose of showing an outstanding title in the heirs of Joseph and Martial Nicaise, and that C. Nicaise had a right to convey to Porter one-seventeenth part only. The act supposed to be referred to will be found in 3 U. S. Stat. at Large, p. 528.

The defendants then introduced:

1. James Johnson, and proved by him that Joseph and Martial Nicaise were both dead; that Joseph Nicaise left five children, among whom was said Charles Nicaise, and that Martial Nicaise left eight children. Witness came to the Bay in 1817; he worked on the Hyde tract. " There is about two hundred feet or over between the Hyde tract and Mrs. Nixon's place." There was a hospital there in 1817; the cabin was burnt up. Mrs. Nixon's house is south of where the cabin was, and her line is south of where the clearing was; there was a line run there in 1821, when Hyde bought from Williams. Smith came to the Bay in 1818, and he

never had a billiard table; Soulon kept one. Westbrook came to the Bay in 1819; that is, witness never saw him until that year; he might have been there before that. The survey of the claim of Joseph and Martial Nicaise included the property claimed by defendants. Williams bought the Hyde tract from Bosworth.

Cross-examined. Witness never knew Rapp or Porter; there might have been a billiard table at the Bay in 1816, and he not know it. There was no clearing about the hospital; it was built in the bushes.

2. J. C. Monet. Witness understood practical surveying. The land described in the deed from Nicaise to Porter, cannot be surveyed without a knowledge of the point of departure. If the southeast corner of the Rapp tract was known, a survey could be made; and so if any other point mentioned in the deed as a point of departure were known.

Cross-examined. Witness was asked in relation to declarations made by White, as to how he claimed title, and upon stating that these statements were made to him as attorney for White, the defendants objected to his answering. The court overruled the objection, as it is stated in the bill of exceptions, because the defendant had introduced him as a witness, and had brought out testimony necessary to be explained, and the defendant excepted. The witness stated that White told him he claimed under a tax sale made by Avery. The surveys under the Spanish and French governments were made by French and Spanish measures. The tract where old poles lay, in 1823, was called the Porter tract; it was a thicket. The front of the bank on the Bay was washed away in 1819 by a storm. " That he knew the land sued for to be the same named in the deed from Nicaise to Porter. A toise is a French measure of about six feet."

3. J. B. Toulmie stated that he came to the Bay in 1811; never saw Westbrook till 1819. Smith came there in 1816 or 1817; witness never saw a billiard table there till 1820. Witness never knew Lieut. Rapp, or heard of his having any land at the Bay; he knew the Hyde tract and the Addin tract; knew Elihu Carver; never heard him say anything about the lines of the Porter tract. The cabin built by Porter was never finished, and never occupied; Westbrook might have been at the Bay in 1816. There was a claim called

Porter's claim; it is now open, and called White's.    Witness knew the Hyde tract; the Porter and Addin tracts were south of it.

4. E. Carver, Jr., stated that he was a practical surveyor, and the son of Elihu Carver, who was a United States Surveyor at the Bay; witness took the original deed from Nicaise to Porter, and showed it to his father, and asked him if he knew anything about the location of the southeast corner of the Rapp tract, and his father said he did not, and that he knew nothing about the Rapp tract. The Rapp tract, from the description given in the deed to Porter, could not be on the south of the Porter tract, but must necessarily be on the north.

5. D. W. Johnston stated he had read the Porter deed to Elihu Carver; and that the latter said he knew nothing of the Rapp tract.

The plaintiffs proved that they were the heirs of John Porter; and the defendant proved the destruction of the buildings erected by Mrs. Nixon in May, 1858; and that they were worth, before they were burnt, $7000; and that the rent of the land was not worth anything without the improvements.

A great many instructions were asked on both sides, but as none of them are discussed in the opinion of the court, it is unnecessary to set them out.

The jury returned a verdict against both defendants for the land, and also for $2400 rent.

The defendants' motion for a new trial was refused, and they excepted, and sued out this writ of error.

*W. P. Harris,* for plaintiff in error.

*F. Anderson,* for defendant in error.

HANDY, J., delivered the opinion of the court.

This record presents three questions for consideration:

1st. Whether the evidence is sufficient, to identify the land sought to be recovered, with that embraced in the deed of Charles Nicaise to John Porter, upon which the plaintiffs' title depends.

2d. Whether it was competent, under the state of facts shown by the evidence, for the defendants to set up an outstanding title

to the premises, in Martial and Joseph Nicaise, to defeat the recovery of the plaintiffs.

3d. Whether the verdict as to the amount given for mesne profits is not excessive and erroneous.

1. The title of the plaintiffs is founded on a deed executed by Charles Nicaise to John Porter, their father, bearing date in 1816, describing the land as contained within certain specified bounds, and "*beginning at the southeast corner of the land of Lieutenant Rapp;* from thence running north," &c. The land is claimed in the declaration according to the description in this deed; and the first question for consideration is, whether the land sought to be recovered in this action is included within the description of the land specified in the deed. It was manifestly incumbent on the plaintiffs to establish this identity, and much testimony directed to the point was offered by both parties.

After a careful examination of the evidence set out in the record, we are satisfied that the land described in this deed cannot embrace the land in the possession of the defendants, and cannot be the same as that spoken of by the witnesses as " the Porter tract" or the " Porter claim."

The foundation of the plaintiffs' claim, as to identity of the land, is that the land conveyed by the deed to Porter lies immediately south of a tract called the Hyde tract, whose southern line was its northern boundary. That tract is shown to have belonged to Bosworth, and afterwards to Williams and Hyde, and afterwards to Farvè, but never to Rapp. In order, therefore, to establish the locality claimed by the plaintiffs, and to bring their claim within the description contained in their deed, the starting-point of the boundary mentioned in their deed must have been the southeast corner of the Bosworth, Williams, or Hyde tract, and not of the Rapp tract. " The southeast corner of the *Rapp tract*" is the starting-point specified in the deed; and it is shown by the testimony, as it appears to be clear from the nature of the case, that it is absolutely necessary to the location of the land to ascertain and fix that starting-point; for there is no other point or landmark stated in the deed by which it can be located. Hence, if the land lying immediately north of the tract as here claimed was never known as the land of Rapp, it is impossible to maintain that a description

commencing at the southeast corner of the Rapp tract can embrace land lying immediately south of the line of what was called and known as the Hyde tract; and the description and designation of the land in the deed cannot support the claim set up against the land in controversy here.

But it is positively shown by the testimony of Westbrook, a witness for the plaintiff, and the only witness who undertakes to state the locality of the Rapp tract, that that tract lay south of the Addin tract. His testimony shows that the description of the land in the deed cannot be fulfilled by locating the land immediately south of the Hyde tract, and that from his knowledge of the Rapp land, the deed cannot embrace the land here in dispute.

The testimony relied on in support of the claim of the plaintiffs is, principally that of the witness Farvè, who testified that Charles Nicaise had told him that the land lying immediately south of the Hyde tract was the same land sold by him to Porter, and that witness had assisted in running the line between the Hyde tract and what he calls the Porter tract; and that the surveyor, who is since deceased, told him that that was the northern line of the Porter tract. This witness also stated that he knew one corner of the north line of the Porter tract, and saw a post there; that the Porter tract was bounded on the north by the Hyde tract. But the witness also stated that he did not know where the land lay as described in the deed; that he never knew, either of his own knowledge or by report, where the southeast corner of Rapp's tract is, or where that tract was situated; that he did not know where the metes and bounds of the lands as described in the deed are, and could not tell where the land is by the description in the deed.

Considering the purport of this testimony, and especially with reference to the evidence above stated in relation to the locality of the land, it cannot be properly regarded as testimony to establish the boundary of the land conveyed *by the deed*. It was pertinent to the question of what was known as the "*Porter tract*," and what was its northern boundary, and whether Nicaise had not in some manner other than by the deed, sold that tract to Porter.

If the landmarks designated in the deed had been destroyed, or no particular landmarks or monuments had been mentioned in it, it might have been competent to show the boundaries of the tract by

proving declarations of persons, presumed from their situation to have a knowledge of it.  But where the boundary is designated, and capable of being readily ascertained by measurement, it is not competent to show, in a proceeding like this, that it is a mistake, and to show by hearsay what was intended to be conveyed in opposition to the definite description in the deed.  For that would be to prove by parol a conveyance of a different tract of land from that mentioned in the deed.

The question was, whether the land conveyed by the deed, and as therein described, lay immediately south of the Hyde tract?  If it did, as claimed by the plaintiffs, there was no difficulty in establishing the fact, and no necessity for resorting to hearsay testimony, as is fully shown by the statements of the witness under consideration.  If it did not, it was not embraced in the deed, and the plaintiffs' claim was without legal foundation.  It was immaterial to the question in issue and to the title claimed by the plaintiffs, whether Nicaise had sold the land south of the Hyde tract to Porter, or whether the northern boundary of the tract so sold was the southern boundary of the Hyde tract; for the plaintiffs founded their claim upon the deed; and if the land was not embraced in the boundaries therein stated, they could not recover upon the deed.

It is possible that Nicaise sold the land called the Porter tract to Porter, at some other time, and by some other mode than by this deed.  For it is shown that Porter was in possession of the land, by building a cabin upon it, and using it as a hospital for the sick under his charge.  But this would not establish the plaintiffs' claim, as here asserted; for the deed being the foundation of their claim, it is clearly shown that the land is not embraced within its description, and therefore that no title to it was conveyed thereby; and this is manifest from the testimony of this witness.  But if the testimony under consideration could have any effect in support of the plaintiffs' title, it must be on the ground of showing by parol, that the land immediately south of the Hyde line was intended to be embraced in the deed of Nicaise offered in evidence.  The testimony was clearly incompetent in this aspect; and it appears to be the only point of view in which it is calculated to sustain the plaintiffs' claim.  It was not sufficient in law to establish the plaintiffs' title.

But if it be conceded, that the deed conveyed the land immediately south of the Hyde line, it is shown quite clearly, by the testimony, that the hotel lot of the defendant Nixon is not embraced in the so-called Porter tract.   Johnson testifies that the hotel lot is over two hundred feet from the Hyde line.   The Porter tract embraced one hundred and eighty or one hundred and ninety feet in width, south from the Hyde tract.   But the deed to Nixon was only for seventy feet, lying immediately north of the division line between Pray's heirs and White; so that the hotel lot, if it be more than two hundred feet from the Hyde line, as stated by Johnson, could not have embraced any part of the Porter tract, which extended one hundred and eighty or one hundred and ninety feet only, south of the Hyde tract.   It must, therefore, have been on the Addin tract.

Apart from these views of the question, the testimony in the present record, upon the point of identity of the land in the possession of the defendants with that conveyed in the deed, appears to be as fully liable to the objection of uncertainty as when the case was heretofore before us ; and upon this ground we think that the testimony is insufficient to sustain the verdict.

2. It appears from the evidence, that the deed was executed in the year 1816, and that Porter was in possession of a parcel of land, on which he built a cabin, which was used as a hospital for sick sailors under his command, and which is probably the land referred to in the testimony as the Porter tract.   He occupied it for the use stated until the year 1819, when he left the Bay St. Louis, with the vessel of which he had the command, and quitted possession of the land, and is not shown to have taken possession of it afterwards, or to have done any act showing that he continued to exercise ownership of it, or to claim it; and it appears to have been sold for taxes in the year 1828, as the property of Porter.   The defendants offered in evidence, and read from the 3d vol. of American State Papers, to show that Martial and Joseph Nicaise had a claim upon the land in controversy ; and read the second section of the Act of Congress of 1819, March 3d, confirming claims contained in the several reports of commissioners, and founded on Spanish orders of survey, &c.   The act of Congress offered in evidence, is not stated with certainty in the bill of exceptions ; but supposing

the act relied on to be that contained in the 3d volume of the United States Statutes at Large, p. 528, ch. C., and as the question may arise again upon the new trial, we shall consider the act here referred to as the one offered in evidence.

It appears from the evidence, that Martial and Joseph Nicaise are dead, leaving numerous children and heirs, and no conveyance of their title, vested in them in virtue of the act of Congress, is shown. The confirmation of their title by the act of Congress took place subsequently to the date of the deed to Porter, and it appears to be conceded that their claim embraced the land in controversy.

There being no conveyance of their title, and nothing shown to divest it, it must be considered as a subsisting title, unless it is barred by the Statute of Limitations; and the question is, whether Porter and his heirs occupy a position which entitles them to the benefit of the statute.

In order to entitle them to the protection of the statute against the persons shown to have the legal title, it is necessary that they should have been in possession of the land for the period of time required by the statute to create the bar. And though in the case of wild and uncultivated lands, it may not be necessary that they should have been in the actual occupancy, yet it is necessary that they should have exercised acts of ownership sufficient to let it be known to the community that they claimed and exercised ownership of the land. In this case it appears that, in about three years after the date of the deed, Porter abandoned the possession of the land, and is not shown to have exercised any act of ownership over it ever after that time. His claim had not then matured into a valid title under the statute, and the subsequent time, when he has been out of possession, and exercising no control over it, cannot be taken into consideration as a part of the time of his possession. He therefore never had possession for a period sufficient to bar the outstanding title.

Nor can the presumption in favor of the due execution of a conveyance by the person having the legal title, be extended to him, under such circumstances. For that presumption is in support of the possession, and can only prevail where possession has been taken and continued concurrently with the deed under which the party claims title.

But it is objected, that the defendants cannot avail themselves of this outstanding title, because they are mere intruders. It appears that both defendants have possession under color of title, and cannot, therefore, be held to be intruders; and whatever may be said of the title of White, it is evident that the possession of Nixon is in good faith, and under a deed founded on a valuable consideration.

We think, therefore, that under the state of facts shown by the record, it was competent for the defendants to avail themselves of the outstanding title as a defence.

The remaining question is as to the amount allowed for mesne profits.

It appears by the testimony, that after the purchase of a part of the property by Mrs. Nixon, she had a hotel erected on it, worth about six or seven thousand dollars, in the year 1852; that with the hotel upon it, the property would have been worth $450 or $500 per annum; but without the hotel, it would have rented for little or nothing by the year; and that the hotel was destroyed by fire in 1858, and was insured. The verdict was for $2400. The defendants had given notice of their claim for improvements put upon the premises to the amount of $10,000, under the provisions of the statute; but as the hotel, on which that claim was founded, was destroyed by fire before the trial, that claim was not allowed.

The question arising upon these facts is, whether Mrs. Nixon was accountable for the rent of the premises at their value after the erection of the hotel, and which was produced by the erection of the hotel, when she was entitled to nothing for the value of the improvement put on the premises by erecting the hotel, as that had been destroyed by fire before the trial.

The statute allowing to the defendant compensation for valuable improvements, appears to proceed upon the principle of recognizing distinct rights in the parties, as to the value of the land without the improvements put upon it by the defendant and the value with the improvements, allowing the defendant for the value he has thereby added to the land. If he has made no improvements, he is chargeable with the fair value which the use of the land was reasonably worth. But if he has made improvements which are destroyed by casualty, so that no permanent value is imparted thereby to the

land, and he is, therefore, entitled to no compensation for them, is he to be charged with anything more than the land would have been worth, if no improvements had been made? It appears to be just that he should not, and that, in such case, the improvement should be considered, as to both parties, as never having been made. By that rule, no compensation is allowed to the defendant for his improvements, and he sustains a positive loss by their destruction. It would be most unjust to make him chargeable to the owner for a value which he had imparted to the land, and for which he receives no compensation. That would give the owner compensation where he had sustained no injury. But by allowing the owner the just rent of his land, as if the improvement had never been made, he sustains no loss, and·the defendant is in justice bound to pay a fair value for his use of the property; and as the defendant derives no benefit from the improvements, he should not suffer a loss by being made liable to the owner for the enhanced value of the land caused by the improvements during their existence. This appears to be in accordance with the spirit of the statute, as well as the plain dictates of justice. The verdict was founded on the contrary view, and we think it erroneous.

Numerous instructions were granted and refused at the instance of both parties, involving the views above stated. So far as either the refusal or granting of these instructions are in conflict with those views, the action of the court upon them was erroneous, and can be corrected upon the new trial agreeably to the views here stated.

Judgment reversed, and cause remanded for a new trial.